T.C. Memo. 2001-129

UNITED STATES TAX COURT

ORELAND A. AND LUCILLE S. THORNSJO, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5549-95, 8812-95,        Filed June 6, 2001.
          10657-95.

<u>Terrance A. Costello</u>, for petitioners.

<u>Tracy A. Martinez</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  These consolidated cases were assigned to
Special Trial Judge Norman H. Wolfe pursuant to the provisions of
section 7443A(b)(4) in effect when these proceedings commenced,

---

[1]    Cases of the following petitioners are consolidated for
opinion:  Donald L. and Diane J. Woolf, docket No. 8812-95; and
Lawrence J. and Dorothy A. Furlong, docket No. 10657-95.

and Rules 180, 181, and 183. All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge: In so-called affected items notices of deficiency, respondent determined additions to tax with respect to petitioners' Federal income taxes for the years and in the amounts as shown below:

Oreland A. and Lucille S. Thornsjo

| | Additions to Tax | | |
|---|---|---|---|
| Year | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 1979 | $897 | -0- | $5,381 |
| 1980 | 824 | -0- | 4,943 |
| 1982 | 545 | [1] | 1,226 |
| 1983 | 14 | [1] | -0- |

Donald L. and Diane J. Woolf

| | Additions to Tax | | |
|---|---|---|---|
| Year | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 1979 | $1,012 | -0- | $6,070 |
| 1982 | 1,393 | [1] | 5,480 |
| 1983 | 21 | [1] | -0- |

Lawrence J. and Dorothy A. Furlong

| | Additions to Tax | | |
|---|---|---|---|
| Year | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 1979 | $1,878 | -0- | $8,721 |

[1]Fifty percent of the interest payable with respect to the portion of the underpayment that is attributable to negligence. The underpayments were determined and assessed pursuant to a partnership-level proceeding. See secs. 6231-6233. With regard

to petitioners Oreland A. and Lucille S. Thornsjo, respondent determined underpayments attributable to negligence of $10,901 and $285 for 1982 and 1983, respectively.  With regard to petitioners Donald L. and Diane J. Woolf, respondent determined underpayments attributable to negligence of $27,859 and $424 for 1982 and 1983, respectively.

The issues for decisions are:  (1) Whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations and (2) whether petitioners are liable for additions to tax under section 6659 for underpayments of tax attributable to valuation overstatements.

### FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.[2]  Petitioners Oreland A. and Lucille S. Thornsjo resided in St. Louis Park, Minnesota, when they filed the petition in this case.  Petitioners Donald L. and Diane J. Woolf resided in Chaska, Minnesota, when they filed the petition in this case.  Petitioners Lawrence J. and Dorothy A. Furlong resided in White

---

[2]    It would appear that petitioners have abandoned any contention regarding the statute of limitations (the so-called Davenport issue).  This Court's opinion on that issue was affirmed by the Court of Appeals for the Eleventh Circuit.  See Davenport Recycling Associates v. Commissioner, 220 F.3d 1255 (11th Cir. 2000), affg. T.C. Memo. 1998-347; West v. Commissioner, T.C. Memo. 2000-389; Kohn v. Commissioner, T.C. Memo. 1999-150; see also Klein v. United States, 86 F. Supp. 2d 690 (E.D. Mich. 1999); Clark v. United States, 68 F. Supp. 2d 1333, 1342-1346 (N.D. Ga. 1999).  However, if we are mistaken in this regard, then we refer the parties to paragraphs 17 and 18 of the stipulation of facts, and we decide the Davenport issue in respondent's favor based on the foregoing precedent.

Bear Lake, Minnesota, when they filed the petition in this case.

References to Thornsjo are to petitioner Oreland A. Thornsjo.

References to Woolf are to petitioner Donald L. Woolf.

References to Furlong are to petitioner Lawrence J. Furlong.

A.  The Hamilton Transactions

These consolidated cases are part of the Plastics Recycling group of cases.  The additions to tax arise from the disallowance of losses, investment credits, and energy credits claimed by petitioners with respect to a partnership called Hamilton Recycling Associates (Hamilton or the partnership).

For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993).  The underlying transactions involving the Sentinel recycling machines (recyclers) in these cases are substantially identical to the transactions in Provizer v. Commissioner, supra.

In a series of simultaneous transactions closely resembling those in Provizer, that for convenience are referred to herein as the Hamilton transactions, Packaging Industries Group (PI) of

Hyannis, Massachusetts, manufactured and sold[3] four Sentinel EPS[4] Recyclers to Ethynol Cogeneration, Inc. (ECI) for $1,520,000 each. The sale of the recyclers from PI to ECI was partially financed with nonrecourse promissory notes. For each recycler, ECI agreed to pay PI $112,750 in cash and a 12-year nonrecourse promissory note of $1,407,250.

Simultaneously, ECI resold the recyclers to F & G Equipment Corp. (F&G) for $1,750,000 per machine. For each machine, F&G agreed to pay ECI $128,250 in cash, with the balance financed through a partial recourse promissory note of $1,621,750. The note was recourse to the extent of 20 percent of its face value. However, the recourse portion was payable only after the nonrecourse portion was satisfied.

In turn, F&G leased the recyclers to Hamilton. Pursuant to the lease and in accordance with applicable provisions of the

---

[3]     Terms such as sale and lease, as well as their derivatives, are used for convenience only and do not imply that the particular transaction was a sale or lease for Federal tax purposes. Similarly, terms such as joint venture and agreement are also used for convenience only and do not imply that the particular arrangement was a joint venture or an agreement for Federal tax purposes.

[4]     EPS stands for expanded polystyrene. The case of Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993), involved Sentinel expanded polyethylene (EPE) recyclers. However, the EPS recycler partnerships and the EPE recycler partnerships are essentially identical. See Davenport Recycling Associates v. Commissioner, supra; see also Ulanoff v. Commissioner, T.C. Memo. 1999-170 (same); Gottsegen v. Commissioner, T.C. Memo. 1997-314 (involving both the EPE and EPS recyclers).

Internal Revenue Code and Treasury regulations, F&G elected to treat Hamilton as having purchased the recyclers for purposes of the investment and business energy tax credits.

Simultaneously, Hamilton entered into a joint venture with PI and Resin Recyclers Inc. (RRI) for the "exploitation" of the recyclers. The joint venture agreement provided that RRI was to assist Hamilton with the placement of recyclers with end-users. At the same time, PI, ECI, F&G, Hamilton, and RRI entered into arrangements providing that PI would pay a monthly joint venture fee to Hamilton, in the same amount that Hamilton would pay as monthly rent to F&G, in the same amount as F&G would pay monthly on its note to ECI, in the same amount that ECI would pay each month on its note to PI. In connection with these arrangements, PI, ECI, F&G, Hamilton, and RRI entered into offset agreements providing that these monthly payments would only be kept as bookkeeping entries, and no money actually was transferred. Consequently, all of the monthly payments required among the entities in the above transactions offset each other, and the transactions occurred simultaneously.

The parties have stipulated that as of September 30, 1983, only one Sentinel EPS recycler was placed in service by Hamilton. However, on its 1982 tax return, also stipulated in evidence, Hamilton reported that the four recyclers had a combined basis of $7 million for purposes of the investment and business energy tax

credits. The parties further stipulated that in 1982 the recyclers were not properly valued at $1,750,000 each but instead had a maximum value of only $30,000 to $50,000 each. On its 1982, 1983, and 1984 tax returns, Hamilton reported net ordinary losses of $713,291, $36,205, and $16,720, respectively. The losses and credits reported by Hamilton on its tax returns were passed through to Hamilton's limited partners. The portions attributable to petitioners, respectively, were included on Schedules K-1 (Form 1120S), Partners Share of Income, Credits, Deductions, Inc., issued to them and filed with Hamilton's tax returns.

## B. The Private Offering Memorandum

Generally, Hamilton distributed a private offering memorandum to potential investors. The offering memorandum informed investors that Hamilton's business would be conducted in accordance with the transaction described above. The offering memorandum also warned potential investors of significant business and tax risks associated with investing in Hamilton.

Specifically, the offering memorandum warned potential investors that: (1) There was a substantial likelihood of an audit by the Internal Revenue Service (IRS); (2) "On audit, the purchase price of the Sentinel EPS Recyclers to be paid by F&G to ECI may be challenged by the * * * [IRS] as being in excess of the fair market value thereof, a practice followed by * * * [the IRS] in transactions it deems to be tax shelters"; (3) the

partnership had no prior operating history; (4) the limited partners would have no control over the conduct of the partnership's business; (5) there was no established market for the Sentinel EPS recyclers; (6) there are no assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) certain potential conflicts of interest exist.

The offering memorandum contained a marketing opinion by Stanley Ulanoff (Ulanoff) and a technical opinion by Samuel Burstein (Burstein). Ulanoff owned a 4.37-percent interest in Taylor Recycling Associates, which purported to lease four plastic recyclers, and Burstein owned a 5.8-percent interest in Jefferson Recycling Associates, which also purported to lease four plastic recyclers. The offering memorandum disclosed that Burstein was a client of PI's corporate counsel. The offering memorandum also warned potential investors not to rely on the statements and opinions contained in the memorandum, but to conduct an independent investigation.

C.  Partnership-Level Litigation

On March 3, 1989, respondent issued Notices of Final Partnership Administrative Adjustment (FPAA) to Hamilton's tax matters partner (TMP) for 1982, 1983, and 1984. Subsequently, on March 13, 1989, copies of these FPAA's were issued to Thornsjo, Woolf, and Furlong. In the FPAA's, respondent disallowed the

losses that Hamilton had reported on its 1982, 1983, and 1984 Federal income tax returns and determined that Hamilton did not incur "a loss in a trade or business or in an activity entered into for profit or with respect to property held for the production of income." In the FPAA's, respondent also determined that for purposes of the investment tax and business energy credits Hamilton's basis in the recycling equipment was zero, rather than $7 million.

Subsequently, a petition was filed by Hamilton's TMP. On February 23, 1994, the Court entered a decision in Hamilton Recycling Associates v. Commissioner, docket No. 9990-89. This decision reflects a full concession by Hamilton of all items of income, loss, and the underlying equipment valuation used for tax credit purposes.

D. Richard C. Schluter

Richard C. Schluter (Schluter) is a certified public account (C.P.A.), who practiced from 1964 until his retirement in 1991. Much of his practice related to the construction industry, and many of his clients needed bonding for contracts. Also, he represented individuals, and about half his practice was tax-related.

In the late 1960's, Schluter became involved with various aspects of tax shelter promotions. From 1971 until his retirement, Schluter compiled public offering securities audits, mostly for tax shelter promotions. Schluter also reviewed tax

shelter prospectuses for clients who were considering investing in them.  At times he would invest along with his clients because in his view if "a person didn't get involved, they did not know what they were talking about."  Prior to 1982, Schluter had participated as a general partner of a limited partnership that owned an apartment house.  Prior to 1982, less than 1 percent of Schluter's clients' tax returns ever were audited by the IRS.  As to tax shelters, only one of Schluter's clients who invested in a computer leasing transaction was audited before 1982, and this audit resulted favorably for his client, who received a refund from the IRS.

In October 1982, Schluter learned about a tax shelter involving Hamilton when Paul Fitzgerald, a client and former partner in Schluter's C.P.A. firm, asked him to review Hamilton's private offering memorandum.  Schluter reviewed the offering memorandum and noted that the prospectus was throughly prepared; it contained a tax opinion from a New York law firm; it included the marketing opinion of Stanley Ulanoff (Ulanoff) and the technical opinion of Samuel Burstein (Burstein).  Schluter considered that the financial projections prepared by the C.P.A. appeared to be reasonable.  Schluter never inquired into Ulanoff's or Burstein's background.  Schluter also arranged for his firm's tax manager, Don Wilson (Wilson), to review the Hamilton offering memorandum.  After reviewing the prospectus and discussing it with Wilson and Fitzgerald, Schluter concluded that

the recyclers' actual value was a potential issue. However, from his experience prior to 1982 it was Schluter's view that an audit was unlikely and that even if the IRS questioned the recyclers' value, the IRS would merely adjust the recyclers' value and reduce an investor's deductions and credits.

Subsequently, Schluter requested that Ernest Mejia, a licensed financial broker, review the Hamilton transaction. In 1979 or 1980, Schluter had become acquainted with Mejia, who sold life insurance to and instituted an employee stock ownership plan for a company owned by Woolf. Schluter also had prepared Mejia's tax return for 1 year.

In addition to reviewing the financial projections in the offering memorandum, Mejia visited PI's business location to observe the operation of a recycler. Based upon his observation, Mejia reported to Schluter that the recyclers appeared to operate satisfactorily. However, Mejia's involvement with Hamilton was not limited to reviewing the transaction. Mejia also acted as a broker on the transaction.

Schluter also learned of a C.P.A. in Oklahoma who was familiar with the plastic recycler transactions. Schluter was told that the Oklahoma C.P.A. was "so sold on the program he became a general partner." Schluter and the Oklahoma C.P.A. discussed the recyclers' value and agreed that they had reservations regarding the value of the recyclers. However, Schluter and the Oklahoma C.P.A. conjectured that based upon the

cost of computers at the time the recyclers appeared to be reasonably priced. In his testimony, Schluter did not explain how the cost of computers is related to the value of the recyclers.

Schluter acknowledges that he does not have any education or experience in the plastics or plastics recycling industries. Despite this lack of expertise, Schluter contends that he believed that Hamilton was a good investment because plastic is a byproduct of oil and in the early 1980's oil was in limited production. Schluter also believed that as a result of increasing oil prices the price per pound of recycled plastics would be increasing. Sometime during 1982, Schluter advised Thornsjo, Woolf, and Furlong to invest in Hamilton. At this time, Schluter also explained to Thornsjo, Woolf, and Furlong that Hamilton was a tax shelter. In his words: "They knew it was a tax shelter."

Subsequently, Schluter reviewed Hamilton's 1982 financial statements. In 1983, Schluter learned that Hamilton, as well as other plastics recycling partnerships, were being audited by the IRS. Sometime thereafter, Schluter contacted the accounting firm that represented Hamilton during the audit. Schluter asserts that Hamilton's accountants told him that the IRS reviewed the partnership's records and completed their work without comment.

On August 13, 1983, Schluter read a Wall Street Journal (WSJ) article that reported that the plastics recycling promoters

had agreed to an injunction that barred them from promoting tax shelters. On August 15, 1983, Schluter received and reviewed a letter from Hamilton's TMP that discussed the WSJ article. Sometime thereafter, petitioners contacted Schluter regarding the article. Schluter told petitioners that Hamilton's TMP had sent him a letter discussing the WSJ article and that the letter addressed his concerns.

In 1984, petitioners contacted Schluter regarding IRS correspondence they had received, which stated that deductions and credits relating to Hamilton were not allowable and that the IRS planned to audit their returns. On September 11, 1984, the IRS began an audit of Hamilton by contacting Hamilton's TMP. Thereafter, Hamilton's TMP kept Schluter and other Hamilton investors advised of all developments regarding the IRS audit.

E.  Thornsjo

After his graduation from the University of Minnesota with a bachelor of arts degree and military service and 2 years of graduate school education, Thornsjo began working for Honeywell as a manager in the avionics field. Thornsjo worked for Honeywell for 35 years. Immediately before his retirement, Thornsjo was the director of Honeywell's automatic test equipment business, a $145 million business. Previously Thornsjo had been employed as the general director of Honeywell's Apollo program. Thornsjo's business experience is reflected by his accomplishments at Honeywell in the area of operational

management and organizational development and by various managerial achievements as well as the highly responsible position to which he rose during his career as a result of his ability.

Thornsjo met Schluter and retained his services as a C.P.A. sometime during 1978. Prior to 1982, Thornsjo had invested only small amounts in the stock market. In 1982, Thornsjo learned about Hamilton from Schluter. However, Thornsjo did not receive or review Hamilton's offering memorandum. Instead, Thornsjo met with Schluter a number of times and discussed the offering memorandum with him. During these discussions, Schluter explained that Hamilton was involved in a high-risk business. Schluter also told Thornsjo that he had reservations regarding the recyclers' valuation.

During one of these discussions, Schluter gave Thornsjo a sample of recycling material. Thornsjo contends that he took the sample to a chemical engineer at Honeywell. Thornsjo asserts that this Honeywell engineer told him that there were no other plastics recycling machines on the market. Thornsjo also contends that he consulted with a colleague who was familiar with investments. Thornsjo claims that his colleague told him that investing in startups held risks but generally made sense. At trial, Thornsjo did not provide any details regarding the engineer's or his colleague's background or their familiarity

with the plastics recycling industry.  Moreover, the engineer and Thornsjo's colleague did not testify during the trial.

Thornsjo does not have any education or experience with the plastics or plastics recycling industries.  Moreover, Thornsjo did not personally review the Hamilton offering memorandum prior to investing in Hamilton.  He did not employ a capable and responsible person to investigate the value of the plastic recyclers before investing.  Instead, Thornsjo contends that he relied upon Schluter's, the Honeywell engineer's, and his colleague's advice when he invested in Hamilton.  Thornsjo also contends that he invested in Hamilton because he considered Hamilton a good investment for his retirement.  In 1982, Thornsjo paid $25,000 for his partnership interest in Hamilton.

As a result of his investment in Hamilton, on his 1982 Federal income tax return Thornsjo claimed a net operating loss deduction of $19,578 and investment tax and business energy credits totaling $38,500, which was limited to his 1982 income tax liability (as reduced by the partnership loss) of $4,088. The balance of the credits, $34,412, was carried back to 1979 and 1980 to generate tax refund claims of $17,937 and $16,475, respectively.  On his 1983 Federal income tax return, Thornsjo claimed a net operating loss deduction of $963 as a result of his investment in Hamilton.

F.  Woolf

In 1965, Woolf started a construction equipment company called Ditch Witch of Minnesota (Ditch Witch).  Ditch Witch sold heavy equipment for underground construction such as boring, trenching, hauling, backhoe and related components.  Describing his business career Woolf said he started Ditch Witch "from nothing, and built it to a very successful business."  In the early 1980's, Ditch Witch had annual gross receipts of $1,500,000 to $2,500,000.

Prior to 1982, Woolf had made only modest investments in securities.  He did invest in a bowling alley with four other individuals, but Woolf decided "it looked like a Mickey Mouse deal" and sold his interest for a long-term capital gain of more than $25,000 in 1979.  Although Schluter brought other proposals to his attention, Woolf preferred to invest his capital in Ditch Witch.  He did invest individually in rental properties throughout Minnesota, but these were mostly shop facilities that he owned and rented to Ditch Witch.  Also, Woolf sold 30 percent of Ditch Witch to employees through an ESOP.  Ditch Witch also had a target pension plan, in which Woolf participated.  At the time of trial, Woolf still owned 30 to 40 percent of Ditch Witch and had sold or otherwise transferred the rest to his son-in-law.

Sometime during 1978, Woolf met Schluter. Thereafter Schluter prepared Woolf's and Ditch Witch's tax returns. In addition, Schluter provided tax and business advice to Woolf.

In 1982, Schluter told Woolf about Hamilton. As a result, Woolf received and briefly reviewed the Hamilton offering memorandum, but he did not read the entire offering memorandum.

Before he invested in Hamilton, Woolf was informed that Schluter had reservations as to the value of the recyclers. Nevertheless, Woolf did not take any further steps to determine whether the recyclers were accurately valued. Woolf has no education or work experience in the plastics recycling or plastics industries.

In 1982, Woolf paid $25,000 for his partnership interest in Hamilton. Woolf contends that he invested in Hamilton because of Schluter's advice. Woolf also contends that he participated in Hamilton because he believed recycling was good for the environment. Schluter told Woolf that Hamilton was a tax shelter. Woolf understood the meaning of the term "tax shelter" and knew that Hamilton was a tax shelter.

As a result of his partnership interest in Hamilton, on his 1982 Federal income tax return Woolf claimed a net operating loss deduction of $19,578 and investment tax and business energy credits totaling $38,500, which was limited to his 1982 income tax liability (as reduced by the partnership loss) of $18,266.

The balance of the credits, $20,234, was carried back to 1979 to generate a tax refund claim of $20,234. On his 1983 Federal income tax return, Woolf claimed a net operating loss deduction of $962 from his investment in Hamilton.

## G. Furlong

After graduating from high school, Furlong went to work for his family's gasoline and fuel business, Furlong Oil, Inc. Furlong Oil was a distributor for Phillips Petroleum Co. and delivered fuel oil to homes and gasoline at wholesale to service stations. Upon his father's death in 1964, Furlong took over Furlong Oil. Furlong sold the business in 1992 and retired in 1996. During 1979 and other years, Furlong was a member of a partnership that leased 12 over-the-road trucks to one company, United Petroleum. The partnership was paid per mile, both ways, loaded and empty, and hauled freight out of Chicago. On his 1979 Federal income tax return, Furlong reported that he received from United Petroleum rental income of $117,714, in addition to his salary of $27,657 from Furlong Oil.

Furlong met Schluter sometime during 1975 or 1976. Thereafter, Schluter did all of the record keeping and accounting work for Furlong Oil. He prepared all of Furlong Oil's tax returns, as well as Furlong's personal tax returns. Furlong also developed a social relationship with Schluter, and they regularly had lunch and played golf together.

Prior to 1982, Furlong did not make many investments. In 1981 at Schluter's suggestion, he did invest in a partnership called Jacobs and Stewart that was building office buildings. Furlong considered this investment unsuccessful. His 1979 tax return also reflects an investment in Glenaire Apartments and in several investments described as "Gas and Go Ten-Ten Truck Stop" and "Schmidt and Furlong Gas and Go". Sometime during 1982, Schluter told Furlong about Hamilton while they were playing golf. Subsequently, Schluter and Furlong discussed Hamilton a number of times, generally during their golfing afternoons, and as a result of these discussions, Furlong paid $25,000 for his partnership interest in Hamilton.

Furlong does not have any education or work experience in the plastics recycling or plastics industries. Moreover, Furlong did not personally review Hamilton's offering memorandum or investigate Hamilton before becoming a participant in the partnership. Instead, Furlong relied upon Schluter's advice about Hamilton. Furlong also contends that Schluter never told him that he had questions regarding Hamilton's valuation of the recyclers. Furthermore, Furlong asserts that he invested in Hamilton for additional income for his retirement because Furlong Oil did not have a pension plan. However, Furlong also testified that he knew that Hamilton was a tax shelter. Schluter told Furlong that Hamilton was a tax shelter; Furlong knew what a tax

shelter was; and Furlong knew that in purchasing a partnership interest in Hamilton he was buying an interest in a tax shelter.

As a result of his investment in Hamilton, Furlong carried back to 1979 a net operating loss deduction of $20,361. Furlong also carried back investment tax and business energy credits that he had claimed on his 1982 Federal income tax return that were in excess of his 1982 tax liability. Accordingly, Furlong carried back a balance of the credits to 1979 to generate a tax refund claim.

## OPINION

We have decided many Plastics Recycling cases. Most of these cases, like the present case, raised issues regarding additions to tax for negligence and valuation overstatement. See, e.g., West v. Commissioner, T.C. Memo. 2000-389; Barber v. Commissioner, T.C. Memo. 2000-372; Barlow v. Commissioner, T.C. Memo. 2000-339; Carroll v. Commissioner, T.C. Memo. 2000-184; Ulanoff v. Commissioner, T.C. Memo. 1999-170; Gottsegen v. Commissioner, T.C. Memo. 1997-314; Greene v. Commissioner, T.C. Memo. 1997-296; Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, T.C. Memo. 1997-259 n.13 (and cases cited therein), affd. sub nom. Addington v. Commissioner, 205 F.3d 54 (2d Cir. 2000). In all but two of those cases, we found the taxpayers liable for the additions to tax for negligence. Moreover, in all of those cases we found the taxpayers liable for additions to tax for valuation overstatement.

In <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, the test cases for the Plastics Recycling group of cases, this Court: (1) Found that each recycler had a fair market value of not more than $50,000; (2) held that the transaction, which was virtually identical to the transactions in the present cases, was a sham because it lacked economic substance and a business purpose; (3) sustained the additions to tax for negligence under section 6653(a)(1) and (2); (4) sustained the addition to tax for valuation overstatement under section 6659 because the underpayment of taxes was directly related to the overvaluation of the recyclers; and (5) held that the partnership losses and tax credits claimed with respect to the plastics recycling partnership at issue were attributable to tax-motivated transactions within the meaning of section 6621(c). We also found that other recyclers were commercially available during the year in issue. See <u>Provizer v. Commissioner</u>, <u>supra</u>. In reaching the conclusion that the transaction lacked a business purpose, this Court heavily relied upon the overvaluation of the recyclers. Similarly, in <u>Gottsegen v. Commissioner</u>, <u>supra</u>, we found that each Sentinel EPS recycler had a fair market value not in excess of $50,000.

## A. Section 6653(a)(1) and (2) Negligence

In each of the present cases, respondent determined that petitioners were liable for additions to tax for negligence under section 6653(a)(1) and (2) with respect to an underpayment

attributable to petitioners' investment in Hamilton.  In each case, petitioners contend that they were not negligent because: (1) They reasonably relied in good faith upon the advice of a competent and experienced accountant in deciding to invest in Hamilton, and (2) they intended to make a profit from their investment in Hamilton.  Thornsjo also argues that he was not negligent because he conducted a reasonable independent investigation by consulting an unidentified Honeywell engineer and a work colleague at his place of employment.

Section 6653(a)(1) and (2) imposes additions to tax if any part of the underpayment of tax is due to negligence or intentional disregard of rules or regulations.  Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances.  See Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The pertinent question is whether a particular taxpayer's actions are reasonable in light of the taxpayer's experience, the nature of the investment, and the taxpayer's actions in connection with the transactions.  See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973).  When considering the negligence additions to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment.  See McPike v. Commissioner, T.C. Memo. 1996-46.

1.  Petitioners' Purported Reliance on an Adviser

In each of these cases, petitioners claim that they reasonably relied upon Schluter's advice.  A taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) if he or she reasonably relied on competent professional advice.  See United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); see also American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1116-1117 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered.  See Freytag v. Commissioner, supra.  For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that the professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter.  See Chakales v. Commissioner, 79 F.3d 726 (8th Cir. 1996), affg. T.C. Memo. 1994-408; David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Freytag v. Commissioner, supra; Sann v. Commissioner, supra.

Moreover, reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence.  See Pasternak v. Commissioner, 990 F.2d

893 (6th Cir. 1993), affg. <u>Donahue v. Commissioner</u>, T.C. Memo. 1991-181; <u>Laverne v. Commissioner</u>, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992); <u>Sann v. Commissioner</u>, <u>supra</u>.  Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture.  See <u>David v. Commissioner</u>, <u>supra</u>; <u>Freytag v. Commissioner</u>, <u>supra</u>.

In these cases, the purported value of the recyclers generated the deductions and credits.  This circumstance was clearly reflected in the offering memorandum.  Prior to purchasing partnership interests in Hamilton, Thornsjo and Furlong did not read the offering memorandum and Woolf only briefly reviewed it.  However, Schluter read the offering memorandum and was fully aware of the tax benefits associated with a so-called investment in Hamilton.  In their discussions with Schluter, petitioners surely learned or should have learned about the amount and nature of the tax benefits.  Plainly the tax benefits associated with purchasing a partnership share in Hamilton, including the carrybacks, were very substantial.  The direct reductions claimed on petitioners' tax returns, from the investment tax credit alone, exceeded their cash investment.  Therefore, like the taxpayers in <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, "except for a few weeks at the beginning,

petitioners never had any money in the * * * [partnership transaction]." Under these circumstances, a reasonably prudent person would have asked a qualified adviser if such a windfall were not too good to be true. See McCrary v. Commissioner, 92 T.C. 827, 850 (1989).

Schluter understood that such a windfall was too good to be true. Although, Schluter had no expertise with plastics recycling, Schluter knew that the recyclers' actual value was a potential issue that was likely to be raised by the IRS. Despite his concerns, Schluter failed to consult an independent appraiser or anyone with expertise in plastics or plastics recycling. If Schluter had made a reasonable effort to determine the fair market value of the recyclers, he would have determined that the recyclers' price was grossly inflated. At that point a reasonable person would have inquired why the partnership would be willing to "invest" in machines at far in excess of their fair market value when it could purchase other much less expensive machines that performed virtually the same functions. In any event, Schluter testified that his clients had been audited only rarely and that in his view, even if petitioners were audited, IRS only would adjust the recyclers' value and therefore would reduce petitioners' deductions and tax credits.

Schluter also contends that he discussed the recyclers' value with an unidentified C.P.A. from Oklahoma and with Mejia.

The unidentified C.P.A. and Mejia did not testify at trial. Moreover, petitioners failed to introduce any evidence that indicates that this C.P.A. or Mejia had any expertise in plastics or plastics recycling. Schluter's assertions that he and the unidentified C.P.A. concluded that the recyclers' valuation was reasonable based upon the value of computers in 1982 is unconvincing. At trial, Schluter did not explain how the cost of computers in 1982 related to the valuation of plastic recyclers. Moreover, Mejia acted as a broker on the transactions. See West v. Commissioner, T.C. Memo. 2000-389, concerning Mejia activities in marketing plastic recycling tax shelter partnerships. As we have already stated, reliance on representations by promoters is not an adequate defense to negligence. See Pasternak v. Commissioner, supra; Laverne v. Commissioner, supra; Sann v. Commissioner, T.C. Memo. 1997-259.

Moreover, Schluter's reliance upon the offering materials, which included a marketing report prepared by Ulanoff and a technical opinion prepared by Burstein, to determine the recyclers' value was not reasonable. Schluter never investigated whether Ulanoff or Burstein had an interest in Plastics Recycling transactions. In fact, Ulanoff and Burstein each invested in several Plastics Recycling partnerships. The offering memorandum also disclosed that Burstein was a client and business associate of PI's corporate counsel.

Schluter also made an unconvincing statement that he believed that Hamilton would be economically profitable because plastic is an oil derivative.  At trial, Schluter failed to explain adequately how the so-called oil crisis provided a reasonable basis to invest in Hamilton.  Schluter also failed to explain away the numerous business-related caveats and warnings in the offering memorandum.  Contrary to Schluter's contention, the offering memorandum warned that there could be no assurances that the price of new resin pellets would remain at their then-current level.  Schluter also failed to consult with an independent consultant who had knowledge about plastics or plastics recycling to ascertain the business aspects of the Hamilton transaction.

Prior to 1982, Schluter was fully aware of the concept and practical effect of tax shelters.  From 1964 to his retirement in 1991, Schluter was involved with the preparation and marketing of tax shelters.  During the 1980's besides the media coverage of the so-called oil crisis there was "extensive continuing press coverage of questionable tax shelter plans."  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Under these circumstances, we are convinced that Schluter was not concerned with Hamilton's economic or business aspects.  Rather, we find that Schluter understood and marketed Hamilton as

a tax shelter. Schluter's own testimony supports this conclusion. At trial, Schluter testified that he informed Thornsjo, Woolf, and Furlong that Hamilton was a tax shelter. He expressed certainty that each petitioner knew Hamilton was a tax shelter. Thus it was not reasonable for petitioners to claim substantial tax credits and partnership losses on the basis of Schluter's advice.

2. Thornsjo's Own Investigation of Hamilton

Thornsjo also contends that he was not negligent because he independently investigated the Hamilton transaction by consulting with a Honeywell engineer and a colleague. These individuals did not testify at trial. Moreover, Thornsjo has not provided any evidence that indicates that these individuals had any expertise with plastics or plastics recycling. Under these circumstances, we do not believe that Thornsjo conducted a reasonable independent investigation of Hamilton.

3. Petitioners' Purported Profit Motive

In each of these cases, petitioners contend that they invested in Hamilton for economic profit and as a source of income for retirement. Each petitioner had an extensive business background and had enjoyed a successful career. Furlong and Woolf had been the heads of their own companies, and Thornsjo was a senior executive at Honeywell. Accordingly, all three of these petitioners were experienced businessmen who had been involved

with financial decisions in their business careers. Moreover, petitioners were fully warned by Schluter that the valuation of the recyclers concerned him. Nevertheless, petitioners disregarded these warnings and failed to consult any independent advisers with expertise in plastics or plastics recycling. Petitioners also failed to conduct a reasonable independent investigation into the market value of the recyclers or any of the other economics of the Hamilton transaction.

Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in the Krause case are distinguishable from the facts in these cases. In Krause, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. Krause states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. See id. at 135-136. In holding that the taxpayers in Krause were not liable for the negligence addition to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970s and early 1980s to invest in EOR technology." Id. at 177. While EOR was, according to our opinion in Krause, at the forefront of national policy and the

media during the late 1970's and early 1980's, petitioners have failed to demonstrate that the so-called energy crisis provided a reasonable basis for them to invest in Hamilton.

In addition, the taxpayers in Krause were either experienced in or investigated the oil industry and EOR specifically. One of the taxpayers in Krause undertook a significant investigation of the proposed investment, including researching EOR. The other taxpayer was a geological and mining engineer who hired an independent expert to review the offering materials. See id. at 166. In the present cases, petitioners did not have any experience or education in plastics recycling. Moreover, Woolf and Furlong did not undertake any independent investigation of the recyclers, and Thornsjo's cursory inquiries did not amount to a reasonably thorough investigation, particularly for a person of his stature and background.

Petitioners next argue that they were not negligent because they continued to monitor their investments in Hamilton. To support this argument, petitioners assert that Schluter read a WSJ article regarding Hamilton, that Schluter read a letter from Hamilton's TMP regarding the WSJ article, that they contacted Schluter with regard to the WSJ article, that they contacted Schluter with regard to IRS correspondence, and that Schluter monitored and discussed with them progress reports regarding Hamilton's IRS audit. Contrary to petitioners' arguments, these

minimal and occasional inquiries do not demonstrate that petitioners were concerned with the business aspects or the economic profitability of Hamilton. Instead, these circumstances confirm petitioners' true motivation for investing in Hamilton, which was to receive tax benefits.

## 4. Conclusion as to Negligence

We find that petitioners failed to exercise due care in claiming large deductions and tax credits with respect to Hamilton on their Federal income tax returns. It was not reasonable for petitioners to rely on the offering memorandum, insiders to the transaction, or Schluter. Schluter relied upon the offering memorandum for the value of the recyclers. Neither Schluter nor petitioners undertook a good faith investigation of the fair market value of the recyclers or the underlying economic viability or financial structure of Hamilton. Accordingly, we hold that petitioners are liable for the negligence additions to tax under section 6653(a)(1) and (2).

## B. Section 6659 Valuation Overstatement

In his notices of deficiency, respondent determined that petitioners were liable for section 6659 additions to tax on the portions of their respective underpayments attributable to valuation overstatements. Under section 6659, a graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and is attributable to a

valuation overstatement. See sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. See sec. 6659(c). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. See sec. 6659(b).

Petitioners claimed tax benefits, including investment tax credits and business energy credits, based on a purported value of $1,750,000 for each recycler. In the present cases, petitioners have stipulated that the fair market value of a recycler in 1982 was between $30,000 and $50,000. Accordingly, if disallowance of petitioners' claimed benefits is attributable to such valuation overstatements, petitioners are liable for section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to tax benefits claimed with respect to Hamilton.

Petitioners contend that section 6659 does not apply in their cases because (1) disallowance of the claimed tax benefits was attributable to other than a valuation overstatement, and (2) Hamilton's concession in the underlying partnership case precludes imposition of the section 6659 additions to tax.

1. The Grounds for Petitioners' Underpayments

Petitioners contend that the section 6659 addition to tax does not apply in their cases because the disallowance of the

claimed tax benefits was not attributable to a valuation overstatement. Specifically, petitioners argue that where, as here, the Commissioner completely disallows a tax benefit, the tax underpayment cannot be attributable to a valuation overstatement. Petitioners also contend that there exists an alternate ground for the disallowance of the claimed tax benefits that is independent of an overvaluation overstatement. Petitioners argue that the disallowance of the claimed benefits was partially premised on the fact that only one of the four recyclers leased by Hamilton was placed in service by September 30, 1983. Petitioners cite the following cases to support their argument: Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408; Gainer v. Commissioner, 893 F.2d 225 (9th Cir 1990), affg. T.C. Memo. 1988-416; Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987); McCrary v. Commissioner, 92 T.C. 827 (1989).

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements. Todd v. Commissioner, supra at 541; McCrary v. Commissioner, supra at 851. "To the extent taxpayers claim tax benefits that are disallowed on grounds separately and independently from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements." Krause v. Commissioner, 99 T.C. 132, 178 (1992) (citing Todd v. Commissioner, supra). However, when valuation is an integral

factor in disallowing deductions and credits, section 6659 is applicable. See Merino v. Commissioner, 196 F.3d 147 (3d Cir. 1999), affg. T.C. Memo. 1997-385; Zfass v. Commissioner, 118 F.3d 184 (4th Cir. 1997), affg. T.C. Memo. 1996-167; Illes v. Commissioner, 982 F.2d 163 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991), affg. T.C. Memo. 1989-684; Massengill v. Commissioner, 876 F.2d 616 (8th Cir. 1989), affg. T.C. Memo. 1988-427.

Petitioners' reliance on Gainer v. Commissioner, supra, and Todd v. Commissioner, supra, ignores that this Court as well as the Court of Appeals for the Eighth Circuit, the court to which appeals in these cases lie, has held that "When an underpayment stems from disallowed depreciation deductions or investment credit due to lack of economic substance, the deficiency is attributable to overstatement of value, and subject to the penalty under section 6659." Massengill v. Commissioner, supra at 619-620.

We also find that the facts in these cases are distinguishable from the facts in Gainer v. Commissioner, supra, Todd v. Commissioner, supra, and McCrary v. Commissioner, supra. In Gainer and Todd, it was found that a valuation overstatement did not contribute to an underpayment of taxes. In those cases, the underpayments were due exclusively to the fact that the property in each case had not been placed in service. In McCrary, the underpayments were deemed to result from a

concession that the agreement at issue was a license and not a lease. Although property was overvalued in each of those cases, the overvaluation was not the ground on which the taxpayers' liabilities were sustained. In contrast, a "different situation exists where a valuation overstatement * * * is an integral part of or is inseparable from the ground found for disallowance of an item." McCrary v. Commissioner, supra at 859. In the present cases, we find that the overvaluation of the recyclers was integral to and inseparable from petitioners' claimed tax benefits and the determination that Hamilton lacked economic substance.[5]

Petitioners' argument that there exists an alternate ground for the disallowance of the claimed benefits that is independent of an overvaluation statement ignores the facts in their cases. Contrary to petitioners' argument, the FPAA's do not indicate that the disallowance of tax benefits was premised upon the recyclers' not being placed in service. Instead, in the FPAA's respondent determined that Hamilton was not entitled to the

---

[5] To the extent that Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, merely represents an application of Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987), we consider Heasley distinguishable. To the extent that Heasley is based on a concept that where an underpayment derives from the disallowance of a transaction for lack of economic substance, the underpayment cannot be attributable to an overvaluation, this Court, as well as the Court of Appeals for the Eighth Circuit, has disagreed. See Massengill v. Commissioner, 876 F.2d 616 (8th Cir. 1989), affg. T.C. Memo. 1988-427.

losses it reported on its 1982, 1983, and 1984 Federal income tax returns because Hamilton did not incur "a loss in a trade or business or in an activity entered into for profit or with respect to property held for the production of income." In the FPAA's, respondent also determined that Hamilton's basis in the recycling equipment was zero for purposes of the investment tax and the business energy credits. The parties have stipulated that this Court's decision in Hamilton Recycling Associates v. Commissioner, docket No. 9990-89, reflects a full concession by Hamilton of all items of income, loss, and the underlying equipment valuation used for tax credit purposes. In effect the parties in the underlying partnership litigation stipulated that Hamilton was not an activity entered into for the production of income; the transaction lacked economic substance and was a sham. Moreover, a concession based upon petitioners' suggested ground would not have resulted in a full denial of the claimed losses and the recyclers' having a zero basis for purposes of the investment tax and business energy credits. Accordingly, petitioners' suggestion that our decision in Hamilton Recycling Associates was premised upon the recyclers' not having been placed in service is unfounded.

In the present cases, petitioners have conceded that the recyclers' fair market value in 1982 was between $30,000 and $50,000. Petitioners have also conceded that the Hamilton transaction and the recyclers in these cases are substantially identical to the transactions and recyclers considered in

Provizer v. Commissioner, T.C. Memo. 1992-177.  In Provizer, our finding that the recyclers were overvalued was the dominant factor that led us to hold that the transaction lacked economic substance.  See Sann v. Commissioner, T.C. Memo. 1997-259. Similarly, in the present cases the overvaluation of the recyclers was a dominant factor in regard to:  (1) The disallowed tax credits, and other benefits in these cases; (2) the underpayments of tax; and (3) the determination that the Hamilton transaction lacked economic substance.

Lastly, we note that petitioners' argument is similar to the arguments that were raised in other plastics recycling cases. See Merino v. Commissioner, T.C. Memo. 1997-385, affd. 196 F.3d 147 (3d Cir. 1999); Singer v. Commissioner, T.C. Memo. 1997-325; Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, supra.  In all of those cases, we rejected this argument.

2.  Concession of the Deficiency

Petitioners also argue that Hamilton's concession in the underlying partnership case precludes imposition of the section 6659 additions to tax.  Petitioners contend that Hamilton's concession renders any inquiry into the grounds for such deficiencies moot.  Petitioners argue that absent such inquiry it cannot be known whether their underpayments were attributable to a valuation overstatement or other discrepancy and that without a finding that a valuation overstatement contributed to an

underpayment section 6659 cannot apply.  In support of this line of reasoning, petitioners rely heavily upon Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), and McCrary v. Commissioner, 92 T.C. 827 (1989).

Hamilton's concession does not obviate our finding that Hamilton lacked economic substance due to overvaluation of the recyclers.  The value of the recyclers was established in Provizer v. Commissioner, supra, and stipulated by the parties. As a consequence of the inflated value assigned to the recyclers by Hamilton, petitioners claimed deductions and credits that resulted in underpayments of tax.  Regardless of Hamilton's concession in the underlying partnership case, in these cases the underpayments of tax were attributable to the valuation overstatements.

Moreover, concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax.  See Singer v. Commissioner, supra; Kaliban v. Commissioner, supra; Sann v. Commissioner, supra; Dybsand v. Commissioner, T.C. Memo. 1994-56; Chiechi v. Commissioner, T.C. Memo. 1993-630.  Instead, the ground upon which the investment tax credit is disallowed or conceded is significant.  See Dybsand v. Commissioner, supra.  Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax.  See Gainer v.

Commissioner, 893 F.2d 225 (9th Cir. 1990); Irom v. Commissioner, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part T.C. Memo. 1988-211; Harness v. Commissioner, T.C. Memo. 1991-321.

In these cases, petitioners each stipulated substantially the same facts concerning the Hamilton transaction as we found in Provizer v. Commissioner, supra. In Provizer, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the recyclers. The overvaluation of the recyclers, exceeding 2,325 percent, was an integral part of our findings in Provizer that the transaction was a sham and lacked economic substance. Similarly, the overvaluation of the recyclers was integral to and was the core of our holding that Hamilton was a sham and lacked economic substance.

Petitioners' reliance on McCrary v. Commissioner, supra, is misplaced. In McCrary, the taxpayers conceded entitlement to their claimed tax benefits, and the section 6659 addition to tax was held inapplicable. However, the taxpayers' concession of the claimed tax benefits, in and of itself, did not preclude imposition of the section 6659 addition to tax. In McCrary v. Commissioner, supra, the section 6659 addition to tax was disallowed because the agreement at issue was conceded to be a license and not a lease. In contrast, in these cases petitioners' underpayments were attributable to overvaluation of

the recyclers. Accordingly, petitioners' reliance on McCrary v. Commissioner, supra, is inappropriate.[6]

In Provizer v. Commissioner, T.C. Memo. 1992-177, we held that each recycler had a fair market value not in excess of $50,000. Our finding in Provizer that the recyclers had been overvalued was integral to and inseparable from our holding of a lack of economic substance. Petitioners stipulated that the transaction in Hamilton was substantially similar to the transaction described in Provizer, and that the fair market value of the recyclers in 1982 was between $30,000 and $50,000. Given these concessions, and that the overvaluation of the recyclers was integral to and inseparable from the determination that Hamilton lacked economic substance, we conclude that the deficiencies were attributable to the overvaluation of the recyclers.

For the foregoing reasons, we hold that petitioners are liable for the section 6659 additions to tax for valuation overstatement.

---

[6] Petitioners' citation of Heasley v. Commissioner, supra, in support of the concession argument is also inappropriate. The Heasley case was not decided by the Court of Appeals for the Fifth Circuit on the basis of a concession. Moreover, see supra note 5 to the effect that the Court of Appeals for the Eighth Circuit and this Court have not followed the Court of Appeals for the Fifth Circuit's rationale with respect to the application of sec. 6659.

To reflect the foregoing,

<u>Decisions will be entered for</u>

<u>respondent</u>.